417 So.2d 963 (1982)
E. Edward HOLLOWAY, et al., Appellants,
v.
LAKELAND DOWNTOWN DEVELOPMENT AUTHORITY, et al., Appellees.
No. 61295.
Supreme Court of Florida.
June 3, 1982.
*964 Thomas S. Trantham, Bartow, for E. Edward Holloway.
Quillian S. Yancey, State Atty., and Thomas A. Pobjecky, Asst. State Atty., Tenth Judicial Circuit, Bartow, for the State.
Julian Clarkson, Tampa, and Edward W. Vogel, III of Holland & Knight, Lakeland, for Lakeland Downtown Development Authority.
David E. Cardwell, City Atty., and Stephen C. Watson, Asst. City Atty., Lakeland, for the City of Lakeland.
William S. Turnbull and John H. Adams of Pepper, Hamilton & Scheetz, Orlando, for Florida Downtown Development Ass'n, amicus curiae.
OVERTON, Justice.
This is a direct appeal from the trial court's validation of municipal revenue bonds, the proceeds of which are for purchase of property in downtown Lakeland for redevelopment. We have jurisdiction. Art. V, § 3(b)(2), Fla. Const. We find that the subject bonds satisfy both the statutory and constitutional requisites, and affirm their validation.
In 1977, the Florida Legislature created by special act the Lakeland Downtown Development Authority (the authority) to revitalize and preserve property values and to prevent deterioration in the central business district of the city of Lakeland. Ch. 77-588, Laws of Fla. (as amended by ch. 78-549, Laws of Fla.). The Lakeland City Commission, in accordance with that special act, established the boundaries of the authority and, in accordance with the Community Redevelopment Act, chapter 163, part III, Florida Statutes (1979), designated the authority as a community redevelopment agency. The city and the authority thereafter conducted a study of the downtown area within the authority's boundaries which culminated in a city commission hearing and a finding that a slum or blight condition existed.
The authority thereafter adopted a threephase redevelopment plan, later approved by the city commission, which provided for a regional shopping center (phase I), a hotel (phase II), and an office building (phase III). Both the city and the authority claimed that the overall plan would affect the downtown area in a positive fashion. This appeal concerns only phase I, the regional shopping center. To implement phase I, the authority planned to issue three series of revenue bonds, series A, B, and C, the proceeds of which would be used to acquire two and one-half city blocks of downtown Lakeland within the authority's designated boundaries. The property would then be resold to a private concern for construction of the regional shopping center and parking facilities.
The authority subsequently filed a petition in the circuit court to have the bonds *965 validated. A private taxpayer, E. Edward Holloway, and the state, through the state attorney, opposed the validation. The trial court validated the bonds, finding that they satisfied a requisite public purpose and the applicable provisions of chapters 75 and 163, Florida Statutes (1979).
Appellants raise multiple points on appeal; we find that only three merit discussion. The first is whether partial private ownership of redevelopment property purchased with the revenue bonds defeats a public purpose. The second is whether, under chapter 163 and the present facts, there was sufficient evidence of a slum or blighted condition in the redevelopment area. And third is whether the series C bonds are defective because the rate of interest was not specifically set forth in the validation proceedings.
With respect to appellants' first point, we considered a similar bond issue and whether those bonds served a public purpose in State v. Miami Beach Redevelopment Agency, 392 So.2d 875 (Fla. 1980). As in the instant case, part of the plan in that case called for the issuance of revenue bonds for the purchase or condemnation of slum or blighted Miami Beach property, some of which would eventually, after redevelopment, be privately owned. We directly addressed the contention of whether eventual private ownership of purchased or condemned land with revenues derived from the bonds under chapter 163 was constitutional, and concluded that "the use of eminent domain for acquisition and clearance, and substantial private and commercial uses after redevelopment, is in furtherance of a public purpose and is constitutional." We reaffirm our decision in State v. Miami Beach Redevelopment Agency and our belief that eventual partial private ownership of a redevelopment area under chapter 163 does not defeat the public purpose of eliminating slum and blighted areas within our cities.
Appellants' second contention is that the subject bonds are invalid because the authority did not sufficiently establish that the proposed shopping center site was in fact a slum or blighted area. Chapter 163 is specific in its criteria. A slum area is defined as follows:
"Slum area" means an area in which there is a predominance of buildings or improvements, whether residential or nonresidential, which by reason of dilapidation, deterioration, age or obsolescence, inadequate provision for ventilation, light, air, sanitation, or open spaces, high density of population and overcrowding, the existence of conditions which endanger life or property by fire or other causes, or any combination of such factors is conducive to ill health, transmission of disease, infant mortality, juvenile delinquency, or crime and is detrimental to the public health, safety, morals, or welfare.
§ 163.340(7), Fla. Stat. (1979). A blighted area is defined as:
"Blighted area" means an area in which there are a substantial number of slum, deteriorated, or deteriorating structures and conditions which endanger life or property by fire or other causes or one or more of the following factors which substantially impairs or arrests the sound growth of a county or municipality and is a menace to the public health, safety, morals, or welfare in its present condition and use:
(a) Predominance of defective or inadequate street layout;
(b) Faulty lot layout in relation to size, adequacy, accessibility or usefulness;
(c) Unsanitary or unsafe conditions;
(d) Deterioration of site or other improvements;
(e) Tax or special assessment delinquency exceeding the fair value of the land; and
(f) Diversity of ownership or defective or unusual conditions of title which prevents the free alienability of land within the deteriorated or hazardous area.
§ 163.340(8), Fla. Stat. (1979).
On the record before us, we find that the authority was careful to follow all of the specific guidelines promulgated in the redevelopment act. The record shows that before *966 the city commission designated the authority as a chapter 163 redevelopment agency, it considered evidence which showed that eighteen percent of the total square footage of all structures in the redevelopment district was vacant, thirty percent was in poor condition, and fifteen percent was occupied but under-utilized. The study indicated that the situation with respect to the total square footage of commercial structures was even worse. It reflected that there are 141 commercial structures in the designated redevelopment area and, excluding two major retail chain stores from calculations, thirty percent of the square footage in the remaining 139 downtown commercial structures was vacant, forty-eight percent was in poor condition, twenty-four percent was under-utilized, and forty-five percent was over fifty years of age. Other evidence showed that the crime rate in the area was higher than in other local areas, forty-one percent of the dwelling units were substandard, and the demand for office and building space was declining. The tax base was also declining in value. The executive director of the authority testified before the commission that the foregoing developments were attributable in part to undesirable street patterns and multiple ownership of property.
We find that the declaration of slum and blight within the authority's boundaries was proper.
Appellants claim in their final point that the series C bonds are defective because the rate of interest is not specifically set forth. Section 75.04, Florida Statutes (1979), requires that all bond validation complaints set forth "the interest they are to bear." Appellants assert that the proposed series C bonds do not meet the requirement of this section because the instant bonds do not set a specific ceiling, but, rather, provide that "in no event [shall the bonds] exceed the maximum lawful rate as described in Section 215.84, Florida Statutes (Supp. 1980)."
It is the purpose of section 215.84 to allow local government flexibility in setting the rate of interest on revenue bonds so that the bonds will be competitive in the bond market. The section provides a specific formula by which this maximum rate may be calculated. We find that section 215.84 sets a proper and sufficient maximum rate of interest for the instant bonds.
We point out that our present decision is distinguishable from both State v. Leon County, 410 So.2d 1346 (Fla. 1982), and State v. Osceola County Industrial Development Authority, No. 61,205 (Fla. June 3, 1982). In the former, the county issued the then subject revenue bonds under the authority of chapter 159, part II, Florida Statutes (1979). Section 215.84 was of no effect because it specifically excepts revenue bonds created under chapter 159. The latter case is of no effect under the instant facts because chapter 163 bonds were not at issue in that case.
For the foregoing reasons, the trial court is affirmed and the bond validation approved.
It is so ordered.
SUNDBERG, C.J., and ADKINS, BOYD, ALDERMAN, McDONALD and EHRLICH, JJ., concur.